## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **PAMELA PECK,** | **:** |
| | **:** |
| **PLAINTIFF,** | **:** |
| | **:** |
| **V.** | **: CIVIL ACTION NUMBER:** |
| | **:** |
| **SAFETY NATIONAL CASUALTY CORP.,** | **:** |
| | **: JURY TRIAL DEMANDED** |
| | **:** |
| **DEFENDANT.** | **:** |

---

### COMPLAINT

---

Plaintiff, Pamela Peck ("Peck"), brings this Complaint against Defendant Safety National Casualty Corp. ("Safety Corp.") as follows:

### INTRODUCTION

1.

This is a case seeking damages for sex discrimination and retaliation under Title VII of the 1964 Civil Rights Act.

2.

Pamela Peck worked for Safety Corp. for more than fifteen (15) years. Throughout her employment with Safety Corp., she met or exceeded every performance criterion that the Company deemed material. She earned four promotions culminating in her promotion to Business Development Director ("BDD") on January 2, 2017, and a $60,000 raise, plus her inclusion in a long-term incentive agreement.

Between approximately 2009 and 2017, Safety Corp. divided its Business Development Department into two functional teams: The first was the team responsible for finding and developing new business (referred to herein as "hunters"); the second was the team responsible for servicing existing clients and obtaining policy renewals (referred to as "servicers"). Safety assigned Ms. Peck to the "hunters" team. She was the sole female in the Business Development Department assigned to the "hunters" team, with the role focused on pursuit of new business. All her colleagues on the team were male.

Safety Corp. required Ms. Peck to meet assigned premium production goals for various product lines, including its Large Casualty product line. This required her to work in collaboration with Steve Cotnoir ("Cotnoir"), Safety Corp.'s Vice President of Underwriting for its Large Casualty Product Line. Cotnoir was the senior Alpharetta office member in charge of

underwriting and had the authority to decline or pursue a given sales opportunity within his large casualty product line. In approximately 2009, Safety Corp. divided its Business Development department staff between personnel focused on pursuit of new business opportunities and members focused on renewals and serving the existing client base. Between 2009 and 2017, Peck was the only female Business Development employee whose role was focused on pursuit of new business. All of her colleagues in the new business development role were male. In this capacity she was required to collaborate her new business hunting efforts with Cotnoir, the senior Alpharetta office member in charge of underwriting.

From his start with Safety Corp. Cotnoir embarked on a campaign to sabotage Peck's business development efforts. He withheld and refused to share vital data such as competitive information and premium quotes she needed to fulfill her functions, often forcing Peck to contact prospective clients' brokers to obtain the necessary information. He concealed appointments he had scheduled with shared clients to exclude her from important meetings, even marking the appointment entries on his company computerized calendar as "private" to prevent her from learning of them. He tried to undermine her with client prospects and brokers by denigrating the significance of her role and her credibility in conversations with brokers and clients. In contrast to his behavior toward Peck, the sole female on the

"hunters" team, Cotnoir's behavior toward her male colleagues was open, collaborative, and supportive of their business development efforts.

Cotnoir's sexually discriminatory behaviors in his campaign to subvert Peck's performance created such overwhelming stress that she complained to her direct supervisor, Richard Gilmore, and to the Company's Chief Operating Officer, Steve Luebbert. She emphasized that Cotnoir did not do this with her male counterparts. When she suggested that Human Resources needed to become involved, Gilmore replied, "Don't open that can of worms."

Peck told Safety Corp.'s CEO, Mark Wilhelm that she was contemplating quitting because of the stress Cotnoir's behavior created, and that Cotnoir did not the same things to her male colleagues. Wilhelm acknowledged his awareness of the behavior but urged her not to quit, assuring her that Safety Corp. management realized that she was "not the problem." Nevertheless he did nothing to change Cotnoir's behavior toward Peck, even though it violated both Safety Corp.'s Collaboration and Communications and its Equal Employment Opportunity policies. He explained: "Cotnoir is good at his job and you are at yours. And the office is successful." Peck told Wilhelm that to protect herself, she was printing out Cotnoir's calendars showing that he "privatized" (*i.e.,* was hiding) his appointments with her prospective clients, but not with those of her male counterparts. This was

evidence she could use to prove Cotnoir's discriminatory behavior. Cotnoir continued the course of discriminatory conduct unabated until Peck was terminated.

With no prior warning that her own performance or behavior failed to meet company requirements, and despite her solid record of positive performance evaluations, regular promotions and compensation increases, Respondent terminated Pamela Peck on July 27, 2018. The reasons provided for the decision to terminate Peck were pretexts designed to conceal Safety Corp.'s retaliation for Peck's complaints about Cotnoir's sexually discriminatory behavior and the unlawfully hostile working environment it had created for Peck (including her indication that, for her own protection she had begun gathering evidence to prove her complaints). When Peck inquired at her termination what Safety Corp. was doing about Steve Cotnoir. Tom Grove responded: "We decided that you are the problem."

## Jurisdiction and Venue

3.

This Court has original jurisdiction over the present action under Article III, §2 of the United States Constitution and 28 U.S.C §§ 1331, because this case arises under the Title VII, a federal statute that affects interstate commerce.

4.

Venue properly lies in the Northern District of Georgia under 42 U.S.C. § 2000e-5(f)(3) because the bulk of the unlawful employment practices alleged herein occurred in this District.

5.

Venue properly lies in the Northern District of Georgia under 28 U.S.C. § 1391 because Safety Corp. does business and maintains an office located in this judicial district and a substantial portion of the events giving rise to the claims set forth herein occurred in this judicial district.

## THE PARTIES

6.

Peck is a citizen of the United States, and a resident of Cobb County, State of Georgia.

7.

Peck is entitled to bring actions of this kind and nature in this judicial district.

8.

At all times material hereto, Peck was an "employee" of Safety Corp. within the meaning of 42 U.S.C. § 2000e(f).

9.

Safety Corp. is an insurance company with headquarters located at 1832 Schuetz Rd, St. Louis, Missouri. Safety Corp. maintains an Alpharetta, Ga. office located at 1105 Lakewood Parkway.

10.

At all times material hereto, Safety Corp. was authorized to conduct business in the State of Georgia.

11.

At all times material hereto, Peck worked out of Safety Corp.'s Alpharetta office.

12.

Safety Corp. may be served through its registered agent CT Corporation System at 289 S. Culver Street, Lawrenceville, GA 30046-4805, in accordance with Fed. R. Civ. Pro. 4(d).

13.

All times material hereto, Safety Corp. has been an "employer" of Peck within the meaning of 42 U.S.C. § 2000e(b).

14.

Safety Corp. is subject to the personal jurisdiction of this Court.

15.

On or about January 23, 2019, Peck filed a Charge of Discrimination against Safety Corp. with the United States Equal Employment Opportunity Commission ("EEOC"). The EEOC designated this Charge as Charge Number 410-2019-02421 (hereafter referred to as "the Charge of Discrimination").

16.

The EEOC's Notice to Safety Corp. that Peck had filed a Charge of Discrimination stated that Peck asserted that Safety Corp. had subjected her to sex discrimination and retaliation.

17.

Peck filed the Charge of Discrimination within 180 days of the unlawful employment practices alleged therein.

18.

The EEOC issued a Notice of Right to Sue (hereafter "the Notice of Right to Sue") dated, October 26, 2022.

19.

This action is commenced within 90 days of the issuance of the Notice of Right to Sue.

## FACTUAL ALLEGATIONS

### 20.

From June 2003 through July 27, 2018, Safety Corp. employed Peck in various roles culminating in her promotion to Business Development Director ("BDD") on January 2, 2017.

### 21.

At all times material hereto, Safety Corp. was responsible for promulgating employment policies and making employment decisions regarding Peck's employment.

### 22.

As BDD, Peck was the liaison between insurance brokers and company underwriters. Her job responsibilities included but were not limited to: Making regular periodic visits to Safety Corp. National production sources; Identifying, qualifying, and soliciting potential new sources of business; Reviewing new business quotations and following up with the production sources; Identifying and participating in the approval process from new Third-Party Administrators; Reviewing quotes with underwriters to determine where follow-up or other participation was most needed; and Contacting brokers working on new business to obtain any available information that may facilitate writing an account.

23.

Safety Corp. required Peck to meet assigned premium production goals for its various product lines, including its Large Casualty Product Line which was a focused growth product area for Safety Corp., some in collaboration with Cotnoir.

24.

At all times material to Peck's claims, Cotnoir was Safety Corp.'s Vice President of Underwriting for its Large Casualty Product Line.

25.

Safety Corp.'s Large Casualty Product Line was a focused growth product area of the Company that was an integral part of the production goals the Company set for Peck as a Business Development Director. Peck was responsible for interacting with the large brokerage firms that generated those types of clients and the potential new business premium growth for the Company.

26.

As underwriting manager for Safety Corp.'s Large Casualty Product line, Cotnoir had the authority to decline or pursue a given opportunity for the Company if the opportunity was within his product line and territory.

27.

To meet her assigned premium production goals, it was essential for Peck to collaborate with Cotnoir.

28.

Instead of collaborating with Peck, Cotnoir engaged in an ongoing course of sexually discriminatory and hostile behavior to sabotage and diminish Peck's work accomplishments, beginning several years before Peck's termination and continuing until her termination on July 27, 2018.

29.

Cotnoir's course of sexually discriminatory and hostile behavior towards Peck included eliminating her work product so that she would not receive premium credits for clients served jointly with Cotnoir; manipulating client submissions; hiding, withholding and refusing to share vital information and data such as competitive information and premium quotes concerning jointly-served clients that Peck needed to fulfill her functions (sometimes forcing Peck to contact the clients' brokers to obtain the information); concealing appointments with shared clients in order to exclude her from important client meetings by failing to notify her of the meetings and marking them as "private" on his company calendar to prevent her from learning of them; minimizing the significance of Peck's role with jointly-served clients and their brokers; and other actions to undermine Peck's

effectiveness and business credibility in the eyes of clients and Peck's superiors at Safety Corp.

30.

Cotnoir did not engage in similar behaviors with Peck's male colleagues but rather collaborated with Peck's male colleagues.

31.

Cotnoir's behaviors identified above in paragraphs 28 and 29 had the effect of unreasonably interfering with Peck's ability to perform her duties, requiring significant amounts of otherwise unnecessary effort to accomplish her tasks, and creating a demoralizing and oppressive working environment filled with undue frustration, stress, and discouragement for Peck.

32.

Throughout the time she was required to work with Cotnoir, Peck repeatedly complained about Cotnoir's sexually discriminatory and hostile behaviors to her superiors at Safety Corp. including to her direct supervisor, Richard Gilmore, Assistant Vice President for the East Region of Business Development, to Steve Luebbert, her former Department Head, to Tom Grove, Senior Vice President for Business Development, to Mark Wilhelm, Safety Corp.'s CEO, to Jerry Scott, Safety Corp.'s former President, and to

Duane Hercules, Safety Corp.'s President. She told them that Cotnoir did not engage in similar behaviors with her male colleagues.

33.

In the face of Peck's complaints about Cotnoir's sexually discriminatory and hostile behaviors, Safety Corp.'s executives acknowledged their awareness of his behavior and her complaints by responding: "I'll look into it"; "We know, we know, just keep doing your job"; "Try to talk to Steve yourself."

34.

When Peck suggested to Richard Gilmore that Cotnoir's sexually discriminatory and harassing behaviors had gone on long enough and that the Company needed to involve its Human Resources Department in abating it, Gilmore warned her: "Don't open that can of worms."

35.

During a meeting in St. Louis, Safety Corp.'s CEO Mark Wilhelm asked Peck, whether "things [with Cotnoir] were getting any better?" Peck told him that Cotnoir's sexually discriminatory and hostile behavior was worsening rather than improving, that this violated Safety Corp.'s Communications and Collaboration policies and pointed out that Cotnoir did not engage in similar conduct with her male colleagues. Peck told Wilhelm that to protect herself she was printing out Cotnoir's calendars showing

Cotnoir marked his meetings scheduled with her joint clients as "private", but did not do so with her male counterparts, placing Safety Corp. on notice that Peck was compiling evidence proving Cotnoir's sexually discriminating behavior. CEO Mark Wilhelm explained why Safety Corp. accepted Cotnoir's behaviors toward her, telling her: "You are good at what you do, and he is good at what he does. It's unfortunate these cannot be done together. However, the office is successful." When Peck indicated to Wilhelm that she was contemplating quitting because of Cotnoir's behavior and the Company's failures to remedy it, he replied: "No. No. No. Just continue to do your job as you do it well. We know you are not the problem."

36.

At no time during the period Safety Corp. employed her did Peck ever receive a performance appraisal of less than "meets requirements." All of her performance appraisals rated her at either meeting or exceeding Safety Corp.'s requirements.

37.

While Safety Corp. employed her, Safety Corp. never disciplined Peck or otherwise warned her that her performance or behavior was unacceptable or placed her job in jeopardy.

38.

At no time while Safety Corp. employed her did Safety Corp. ever place Peck on a Performance Improvement Plan ("PIP").

39.

Safety Corp. failed to investigate Peck's allegations of sexually discriminating behavior and harassment and took no action to protect Peck from it.

40.

After Peck's discussions with Wilhelm and Hercules, Cotnoir's behavior continued, hiding from Peck his appointments with important jointly-served clients, failing to provide her with information and data needed for business presentations, excluding Peck from important client meetings, excluding her from discussions of potential business opportunities, withholding information about important accounts, denigrating her significance to Safety Corp.'s clients, and withholding follow-up information from business meetings even while providing the information to her male colleagues, some of whom did not even attend the meeting.

41.

On July 27, 2018, Rich Gilmore, Peck's immediate supervisor, and Tom Groves Safety Corp.'s Senior Vice President for Business Development informed Peck that Safety Corp. was terminating her.  During that meeting

Gilmore stated: (1) That she had not "assimilated into the office"; (2) She lacked timely housekeeping and expense account reports; (3) She had expressed a desire to relocate from the Atlanta office; (4) She expressed unhappiness regarding her job; and (5) "With what we are paying you, this just cannot continue."

42.

Each of the termination reasons stated by Gilmore is demonstrably pretextual and discriminatory.

43.

In the same meeting Tom Grove told Peck that Safety Corp. was terminating her because they had decided Peck "was the problem."

## COUNT 1
## SEXUAL DISCRIMINATION IN VIOLATION OF TITLE VII

44.

The allegations set forth in paragraphs 1 through 43 above are incorporated by reference herein as if fully set out in this paragraph.

45.

Cotnoir's actions as described above imposed adverse working conditions upon Peck that Safety Corp. did not impose upon similarly-situated male employees by unreasonably interfering with Peck's performance of her duties, by requiring Peck to exert significant amounts of

otherwise unnecessary effort to accomplish her tasks, creating a demoralizing and oppressive working environment filled with frustration, stress and discouragement for Peck, thereby creating an unlawfully hostile, oppressive working environment because of Peck's sex.

46.

Safety Corp.'s management and executives were aware of Cotnoir's unlawfully discriminatory actions but did nothing to correct them or to protect Peck from the effects of such actions.

47.

In failing to correct Cotnoir's unlawfully discriminatory behaviors described above, and in failing to protect Peck from said actions Safety Corp. condoned and ratified them, failing to provide a working environment for Peck that was free from sexual discrimination and harassment in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. as amended by the Civil Rights Act of 1991, ("Title VII").

48.

As a direct and proximate result of Safety Corp.'s unlawful discrimination  against Peck, she has suffered and continues to suffer loss of income, emotional distress and emotional pain and suffering, in an amount to be proved at trial.

49.

As the direct and proximate result of Safety Corp.'s unlawful retaliation against Peck, she has been forced to incur attorneys' fees and expenses of litigation for which Safety Corp. is liable.

## COUNT 2
## RETALIATION FORBIDDEN BY TITLE VII

50.

The allegations set forth in paragraphs 1 through 49 above are incorporated by reference herein as if fully set out in this paragraph.

51.

Peck's complaints to Company management about Cotnoir's sexual harassment and discrimination constituted activity protected under Title VII.

52.

Safety Corp. had actual knowledge of Peck's complaint about sexual harassment and discrimination and that her actions constituted protected activity under Title VII.

53.

But for Peck's complaining about and informing Safety Corp. that she was compiling evidence to prove conduct made unlawful by Title VII, Safety Corp. would not have terminated Peck's employment.

54.

Safety Corp. retaliated against Peck when it terminated her employment because she reported conduct made unlawful by Title VII.

55.

Safety Corp. acted with malice or with reckless indifference to the federally protected rights of Peck when it terminated her employment.

56.

Safety Corp. retaliated against Peck because she opposed actions and activities made unlawful by Title VII when it terminated her employment.

57.

As a direct and proximate result of Safety Corp.'s unlawful retaliation against Peck, she has suffered and continues to suffer loss of income, emotional distress and emotional pain and suffering, in an amount to be proved at trial.

58.

As the direct and proximate result of Safety Corp.'s unlawful retaliation against Peck, she has been forced to incur attorneys' fees and expenses of litigation for which Safety Corp. is liable.

WHEREFORE, Peck respectfully prays:

    1.  That she be reinstated to her former position;

2. That she be awarded damages to cover all lost income and benefits which she would have received or accrued but for the unlawful actions taken against her;

3. That she be awarded front pay.

4. That she be awarded general damages to compensate her for the emotional injuries, pain and suffering and other losses and injuries suffered as a result the unlawful actions taken against her;

5. That she be awarded punitive damages against Safety Corp. as a consequence of its willful, malicious, reckless, and intentional conduct;

6. That she be afforded a trial by jury;

7. That she be awarded her reasonable attorneys' fees and expenses of litigation; and

8. That she be awarded such other and further relief as is just, equitable and proper.

Respectfully submitted,

101 Marietta Street                          /s/ Michael A. Caldwell
Suite 2650                                   Michael A. Caldwell.
Atlanta, Georgia 30303                       Ga. Bar No. 102775
(404) 979-3150
(404) 979-3170 (f)                           /s/Charles R. Bridgers
(404) 406-5680 (c)                           Charles R. Bridgers
Michaelcaldwell@dcbflegal.com                Ga. Bar No. 080791
charlesbridgers@dcbflegal.com
                                             Counsel for Plaintiff